GRAY ET AL. *v.* HARRIET LANE HOME FOR
INVALID CHILDREN ET AL.

[No. 75, October Term, 1948.]

254

*Decided February 10, 1949.*

The cause was argued before MARBURY, C. J., DELA-
PLAINE, COLLINS, GRASON, HENDERSON, and MARKELL, JJ.

*Daniel B. Leonard* and *Edward H. Burke,* with whom
were *Bowie, Burke & Leonard* on the brief, for the ap-
pellants.

*Stuart S. Janney, Jr.,* with whom were *Venable, Baetjer
& Howard* on the brief, for the Harriet Lane Home.

*H. Vernon Eney* and *Nolan P. Chipman,* with whom
were *Armstrong, Machen & Eney* on the brief, for Safe
Deposit & Trust Co.

COLLINS, J., delivered the opinion of the Court.

This case involves two appeals from a decree of Cir-
cuit Court No. 2 of Baltimore City construing the will
of Jennie Beck, who died January 3, 1921.

On April 12, 1947, the Harriet Lane Home for Invalid
Children of Baltimore City, a Maryland eleemosynary
corporation (hereinafter called the Home), filed a bill
of complaint in Circuit Court No. 2 of Baltimore City
against Jennie Beck Gray, individually and as executrix
of the estate of William C. Beck, deceased, the heirs of
Jennie Beck, the Safe Deposit & Trust Company of Mary-
land, as executor and trustee under the will of Jennie
Beck, deceased, and the State of Maryland, asking that
Court to take jurisdiction under the will of Jennie Beck
without assuming jurisdiction of the further administra-
tion of the aforesaid trust. It also asked, among other
things, that the court grant to the Home relief by its
judgment or decree directing absolute distribution of the
funds, passing under the will, to the Home and fixing
the purposes by which, the places at which, and the method
in which said funds may be used and any conditions or
limitations attached thereto.

Jennie Beck, by her will dated May 11, 1915, after making certain specific bequests, devised and bequeathed her entire net estate to the Safe Deposit & Trust Company of Baltimore, Trustee. She refers to this entire estate as her "trust estate" or as the corpus of her trust estate. She directed the trustee to pay, from the net income thereof, certain sums to or for the benefit of her brother, William C. Beck, for his life, and to hold the surplus income in a separate fund, which she called the "invested income" account of her estate. On the death of her brother which occurred on March 9, 1947, the trustee was directed to transfer and deliver the corpus of the trust estate to the Home,

"said Corpus to be held by the Board of Managers of said Harriet Lane Home for Invalid Children as an endowment fund for the use and benefit of the two wards which have been heretofore built and established, and which are known as 'The Contagious Units',—one for the treatment of diptheria and the other for the treatment of scarlet fever. The said fund is to be held by the Board of Managers of said Corporation, and is to be known as the 'Jennie Beck Memorial Endowment Fund', and the income accruing therefrom is to be used by the said Board of Managers of said corporation to pay for the care and treatment of deserving free patients in said contagious units, to the end that two-thirds (2/3) of the number of beds in each of the said two wards of said contagious units shall be used for the reception, care and treatment of free patients, said free patients to be received, cared for and treated under the same conditions and in the same manner as those patients in said wards in said contagious units from whom the Harriet Lane Home for Invalid Children shall receive remuneration for care and treatment."

The trustee was also directed to pay to the Home on the death of the brother the balance of the invested income account after the payment of the brother's funeral expenses and several small bequests,

"to be used by said corporation in such manner as the

Board of Managers of said corporation shall deem fit and proper, but to the end that the two wards which have been heretofore built and established and are known and designated as 'The Contagious Units' one for the treatment of diptheria patients and one for the treatment of scarlet fever patients, shall be open for the reception of patients under the same terms and conditions as are now in force in regard to the other wards of said Harriet Lane Home for Invalid Children aforesaid. * * * I hereby request that the Harriet Lane Home for Invalid Children shall erect on the walls of each of the said two wards of said contagious units, proper memorial tablets, setting forth the purposes of the fund herein provided, and the donor thereof."

Jennie Beck executed a codicil to her will on March 11, 1919. Except for the fact that this codicil republished the original will, it has no bearing on this case. The total amount involved in this proceeding is approximately $271,000. After hearing before the Chancellor a decree was filed decreeing that the trust under the will of Jennie Beck, deceased, and the trust created by William C. Beck terminated upon the death of William C. Beck on March 9, 1947, and, upon compliance with the terms of the decree, the Safe Deposit & Trust Company should have no further rights, obligations or duties with respect to the trust or with respect to the use of the property constituting the trust. The trustee was directed to pay over and deliver to the Home all securities, cash and other properties included in the so-called "corpus schedule", the "invested income schedule", and the "William C. Beck Schedule", less certain commissions and expenses. The so-called "endowment fund" or "corpus fund" or "Jennie Beck Memorial Fund" was to be kept intact and not used or expended for any purposes whatsoever. The Chancellor further ordered that the sum of $10,257.61, which the Home had used to pay a social worker, should be paid out of the invested income into the hands of the Home and credited to the corpus of the "invested income fund". It was also ordered that the trustee's termina-

tion fee and the counsel fee for the attorney representing the Trustee be paid out of the "Corpus Fund". Although not confining the use of the income from the "endowment fund", the corpus of the "invested income account", and the income therefrom, literally to immediate purposes set out in the will of Jennie Beck, the Chancellor made certain limitations upon the use of those funds.

From that decree Jennie Beck Gray, the niece of the testatrix and the daughter of William C. Beck, individually and as executrix of the estate of William C. Beck, deceased, appeals to this Court. A cross appeal is also taken by the Home.

Jennie Beck Gray contends here that the two wards specified in the will must be kept open with two-thirds of the beds free; that appropriate provisions should be included in the decree to make certain that the testatrix's directions will be followed and her purposes accomplished; and that the Court costs and other expenses should be charged against the "invested income" account. The Home in its cross appeal contends, among other things, that although if the Court so decrees it will carry out the provisions of the will of Jennie Beck as specifically stated therein, it is not restricted in the use of the income to the purposes mentioned because its use for such purposes would involve waste and impair the fulfillment of the testatrix's general intention. It also contends that independent of the construction of the will, any restrictions on the use of the bequests were removed by an agreement signed by William C. Beck on January 22, 1921. It contends also that the payment made by the Home for the social worker was correct and that the court costs and counsel fee were properly directed to be paid out of the corpus of the endowment fund. It also contends that the heirs have no sufficient interest to be affected by the decision as to entitle them to an appeal and that their appeal should therefore be dismissed.

The facts of the case for the purposes of this opinion are substantially as follows. The Home was incorporated on December 24, 1883, as a non-profit corporation, and

since 1912 has constituted the children's division of Johns Hopkins Hospital. It was completed on the Johns Hopkins Hospital grounds in 1912 and consisted of a main building and three pavilions south of the main building. By agreement the buildings of the Home were connected to the heating and lighting plants of the Johns Hopkins Hospital. This agreement provided for the care of inmates, provisions for staffs, nursing, and admission of patients. The Home was to pay Hopkins $1.40 per day per patient and a minimum monthly payment of $900. On January 24, 1948, the Hopkins released the Home from all past obligations under the previous operating agreements, providing the Home paid its annual income less expenses to Hopkins. The original agreement has been modified from time to time. The three pavilions in the Home were originally known as the East, Middle and West Pavilions and later known as Observation Wards I, II and III. Ward I was originally used for the treatment of child patients with scarlet fever and Ward III for the treatment of child patients with diphtheria. The Home was formally opened in November 1912. The East and West pavilions became known as the "Contagious Units" and then as "Observation Wards I and III". Betwen 1912 and the early part of 1916 these two wards were closed from time to time because of lack of funds. During the period from 1915 to 1916 when opened, they were used for the treatment of patients with scarlet fever and diphtheria. It seems clear that these two wards known together as the "Contagious Units" are the wards and "Contagious Units" referred to in the will of Jennie Beck.

On May 11, 1915, Jennie Beck executed her last will and testament here in question. At that time she evidently knew of the uses to which Observation Wards I and III were being put. At that time these wards were closed because of lack of funds with which to operate them. Under the direction of Dr. John Howland, a member of the staff of the Home, funds were solicited in 1916 for the reopening and operation of these two wards.

260

They were used for the treatment of all contagious diseases in the period from the spring of 1916 until 1921.

Jennie Beck, on March 11, 1919, by codicil, republished the original will. She died January 3, 1921. On January 22, 1921, an agreement was entered into between William C. Beck, the trustee, and the Home under which Beck was paid an additional monthly sum and purported to release and deliver to the Home any right, title or interest he might hereafter have in the estate of his sister. On March 5, 1921, William C. Beck executed a deed of trust to the Safe Deposit & Trust Company whereby he delivered certain securities in trust to pay the income to him for life and after his death and as an addition to the gift of Jennie Beck, to transfer and deliver the trust estate to the Home absolutely and free of all trusts to be used in the same manner as set out in the will of Jennie Beck.

The testimony in the case shows that many changes have occurred since the 1915-1921 period in the seriousness and methods of treatment of diseases and in economic conditions. Diphtheria and scarlet fever in the 1915-1921 period were among the most dreaded diseases with a high mortality rate and often with serious after effects. Today methods of treatment and immunization have removed diphtheria as a serious menace. Scarlet fever, under modern methods of treatment, is regarded as a mild disease. Today in Baltimore City the mortality rate from diphtheria is about one-eighth of what it was in the 1915-1921 period and from scarlet fever about one-thirty-third of what it was in that period. The number of cases of diphtheria has dropped to one-fifth of the number in the 1915-1921 period. The number of cases of scarlet fever has not decreased but the disease is now so mild under modern treatment that only a small percentage of the cases are hospitalized. There is testimony in this case from reliable medical authorities that diphtheria is greatly decreasing.

On the other hand infantile paralysis, meningitis, and rheumatic fever and other such contagious and infectious

diseases of children are a great menace to them today. The prevention and treatment of these diseases, fatal to many children and leaving many crippled, are unsolved. There is great need for facilities and funds for their treatment. There is also authoritative medical testimony in this case that applying funds exclusively to diphtheria and scarlet fever would be "an unfortunate use of something that might be very valuable". There is evidently a "crying" need for funds for treatment and prevention among children of infantile paralysis, meningitis, pneumonia in connection with whooping cough and the medical problems presented by these diseases are much greater than those from diphtheria and scarlet fever.

The contagious units referred to in the Jennie Beck will were open wards at the time of her will and at the time of her death. Medical testimony in this case shows that open wards are now considered unacceptable for the care of patients with contagious diseases. Medical testimony shows that although in the 1915-1921 period open wards were utilized for contagious diseases, such is not an approved practice today. Separate rooms are necessary because children are so prone to infection that when put in the same room with other children having the same disease they pick up other bacteria from them. Also the same contagious disease very often involves a number of different types of bacteria so that patients apparently with the same contagious disease in an open ward will cross infect each other. Because of this, the treatment of contagious diseases has been discontinued in Wards I and III and has been transferred to seven large rooms located in the central part of the Home. Three of these rooms are located on the third floor devoted to children over two and four are located on the fourth floor and are devoted to infants under two. Testimony is offered to prove that these rooms are entirely adequate and much more adequate than the wards and also more economical to run.

After the transfer of treatment of contagious diseases to these new rooms in the Home, Wards I and III were remodeled and are used for other purposes. They are now divided into small rooms and are not suitable for contagious diseases. A substantial sum would be required to convert them into large rooms which would not then be satisfactory. Ward I is at present used for a general dispensary to treat out-patients. Ward III is used for the study and treatment of children involving no risk of infection or contagion. If these two wards were converted back for the treatment of contagious diseases great waste and expense would be caused and the new quarters might not then be suitable for the treatment of contagious diseases of children.

Testimony was offered to show that as part of the rebuilding plan of the Hopkins Hospital the Home plans to build a new building near or on the same site now occupied by Wards I and III with substantial space for the care of children with infectious diseases under modern methods and at the least cost. Limiting the use of the funds here in question to Wards I and III as they existed at the time of Jennie Beck's death would seriously handicap the future development of the Home and the treatment of children's diseases.

As to the provisions in the will that the income from the endowment fund be used to pay for the treatment of deserving free patients in the contagious units to the end that two-thirds of the number of beds be used for the treatment of free patients, testimony is offered to show that at the time of Jennie Beck's death the cost per patient day of maintenance was, of course, much lower than that cost today. In 1921 the income from the endowment fund was about $8,500. Now it is about $7,500. The average cost of maintaining a bed in 1921 was much lower than at present. Therefore the income from the endowment fund is not enough by any means today to maintain the same number of beds as in 1921. The Home's out-patient department handles an average of 120 infant patients per day and an additional clinic for

private patients averages 80 per month. The Home's net deficit for the year ending June 30, 1947, was $182,-488, and the Johns Hopkins Hospital's net deficit for the same period was $503,173.

We see no force in the contention of the Home that Jennie Beck Gray, individually and in her capacity as executrix of the estate of William C. Beck, has no such interest in either of said capacities as entitles her to be heard on appeal. Article 5, Section 30, of the Annotated Code of Maryland 1939, provides in part that "An appeal shall be allowed from any final decree * * * by any one or more of the persons parties to the suit, * * *". In this case the Home by its bill of complaint made Jennie Beck Gray, both individually and as executrix, a party to this case. She participated in the proceedings below and has the right of an appeal. This right has been often recognized by this Court. *Hammersley v. Bell*, 134 Md. 172, 181, 106 A. 339; *State Tax Commission v. Western Maryland Railroad Co.*, 188 Md. 240, 245, 52 A. 2d 615.

It has been frequently held by this Court that where property is given to a corporation for such uses or application as are within the scope of its corporate purposes, and there was no intention on the part of the testatrix to create a trust, the gifts cannot be declared void on the ground that they were in trust for indefinite purposes or in conflict with the Rule against Perpetuities. *Baltzell v. Church*, 110 Md. 244, 268, 274, 73 A. 151; *Home for Incurables v. Bruff*, 160 Md. 156, 178, 153 A. 403; *Brandt, Inc., v. Y. W. C. A.*, 169 Md. 607, 612, 182 A. 452. In the case of *Curtis v. Maryland Baptist Union Ass'n*, 176 Md. 430, 5 A. 2d 836, 121 A. L. R. 1516, relied on by Jennie Beck Gray, a bequest was stricken down for the reason that the Maryland Baptist Union Association had no power expressed or implied to establish the Orphans' Home provided for in the bequest to it.

It is not questioned here by any of the parties that the Home is such a corporation as is authorized to accept the gift here bequeathed. There also seems to be no question here that the trust terminated on the death

of William C. Beck.   A person cannot be both the trustee and the *cestui que trust.*   In order to create a trust the legal estate must be separated from the beneficial enjoyment.   A trust cannot exist where the same person possesses both.   *Baltzell v. Church Home and Infirmary, supra,* 110 Md. 274, 73 A. 151; *Rydzewski v. Vestry of Grace, etc., Church,* 145 Md. 531, 536, 537, 125 A. 717; *1 Restatement of Trusts,* Section 99; *Sands v. Church,* 181 Md. 536, 541, 30 A. 2d 771.   This point is well annotated in *Annotations,* 151 A. L. R. 1289, 1290.

As Jennie Beck Gray claims in this case that the gift passing to the Home under this will is subject to conditions attached, the question for our decision is whether the gift here creates an estate on condition subsequent, or whether this is an absolute gift to the Home of the income from the corpus estate, and the invested income estate in its entirety, to be used for the general purposes of the Home.

Conditions subsequent are not favored in the law, because the breach of such a condition causes a forfeiture and the law is averse to forfeitures.   This Court has held that when the language of an instrument does not clearly indicate the grantor's intention that the property is to revert to him in the event it is diverted from the declared use, the instrument does not operate as a restraint upon alienation of the property.   It merely expresses the grantor's confidence that the grantee will use the property so far as may be reasonable and practicable to effect the purpose of the grant.   This Court has gone to great lengths in refusing to imply a condition subsequent which would result in a forfeiture.   It has gone so far as to say that no condition subsequent will be implied unless there is a gift over or unless there are words indicating an intent that the grant is to be void if the condition is not carried out.   *Kilpatrick v. City of Baltimore,* 81 Md. 179, 31 A. 805, 27 L. R. A. 643, 48 Am. St. Rep. 509; *Faith v. Bowles,* 86 Md. 13, 37 A. 711, 63 Am. St. Rep. 489.   *Rydzewski v. Church, supra;* *Columbia Building Co. v. Cemetery of Holy Cross,* 155

Md. 221, 229, 141 A. 525. *Sands v. Church, supra.* The evidence necessary to establish a resulting trust must be so clear, strong and unequivocal as to remove every reasonable doubt as to the existence of the trust. Courts of equity declare resulting trusts in favor of donors for the purpose of carrying out what appears from the circumstances would probably have been the donors' intention, if they had thought of the situation which had arisen. *Sands v. Church, supra,* 181 Md. page 540, 30 A. 2d 771.

The case of *Sands v. Church, supra,* involved a gift, during the donors' lifetime, to the vestry of the Church of the Ascension of certain bonds. At the time of the gift the donors presented to the vestry, with the bonds, a letter which contained the following: "It is our wish that the income from these bonds be used only for the payment of the Ground Rent as it becomes due and said income is not to be used for any other purpose whatsoever, neither must the income of the bonds or the bonds be used to borrow money on." [181 Md. 536, 30 A. 773] In that case the Ascension Church united with another church under the name of Church of the Ascension and Prince of Peace and the vestry agreed to sell the abandoned church property subject to the annual ground rent. It was contended by the residuary legatees under the donors' wills that as the bonds were impressed with a trust, when they were no longer needed for the purpose intended, a resulting trust arose in favor of the donors' estates. In that case this Court affirmed a decree of the Chancellor declaring that the Church of the Ascension and Prince of Peace owned the bonds and cash absolutely. The Court there pointed out that it seemed unreasonable to believe that the donors would have expected some of their money back in case the specified purposes were accomplished without selling all or any of the bonds.

In the case of *Mather v. Knight,* 143 Md. 612, 123 A. 109, a bequest was made to the Convention of the Protestant Episcopal Church in the Diocese of Maryland for the use of the Trustees of the Hannah More Academy for the establishment of a "Mather Memorial" of such

nature as a Miss Lawrence, the then principal, might elect. Miss Lawrence died without making the selection of the memorial. The Court held in that case that it could not be said that the testatrix in directing her testamentary gift to be used in the establishment of a memorial in the Hannah More Academy did not intend to promote the interests and well-being of the school or that she intended it to be applied to objects foreign to its corporate purposes. It also held that the devise and bequests would not fail to take effect because of the failure of the named person to select the memorial mentioned. In holding this bequest to the Academy valid the Court held that the power conferred upon the principal to select the memorial was a naked collateral power.

In *Peter v. Carter*, 70 Md. 139, 16 A. 504, real estate was devised by Julius West to the Rockville Academy in Montgomery County "not to be appropriated to any building or improvement on the academy lot, but to constitute a perpetual fund for education". The trustees proposed to sell the West real estate and to apply the money received therefrom "to the purchase and improvement, for the purpose of using the same as an academy property, of eight acres of land near the town of Rockville, and that not more than $6,000 of the fund be applied to the purchase of this land." The Court in that case found that the language was plain that the property should not be appropriated to any building or improvement on the Academy lot but that it should "constitute a perpetual fund for education", that the testator intended that the income from his property should be applied entirely and exclusively to the educational department of the institution and that in order to preserve the fund, as he constituted it as a permanent and perpetual one, income alone could be used and no part of the principal could be touched. The income was to be used for the payment of salaries to competent teachers engaged in the teaching of the youths who came to the school for the purpose of receiving instruction in the several branches of education there to be taught, according to the terms of its charter. In

that case the Court granted an injunction against the use of the corpus of the fund and provided that the income should be used for the essential and primary purpose of the Academy, which was the education of youths.

The appellant relies strongly on the case of *Mayor & City Council of Baltimore v. Peabody Institute*, 175 Md. 186, 200 A. 375, 376. In that case Mr. J. Wilson Leakin left to the Mayor and City Council of Baltimore "the properties 101-103 N. Howard Street. 113-115 W. Fayette Street. 5 years after my decease, the said properties to be sold and the proceeds invested in a public park." The City filed a bill against the sister and the sole heir at law of the testator and the Peabody Institute of Baltimore, residuary legatee and devisee, wherein it proposed to buy a number of small units of land located in different sections of Baltimore to be known as "The Leakin Park" and to be maintained as a part of the park system of the City of Baltimore. It proposed to establish several playgrounds out of the fund and to reserve an amount necessary for the maintenance and upkeep of said park. The bill asked the Court whether it could purchase a number of separate units of property from the proceeds and income derived from the property and whether it could reserve out of the proceeds such amount as in its discretion might be deemed advisable.

The City contended in that case that while it had authority under the charter to take the fund, it was not restrained in the application of it to any purpose within its corporate powers and that the use of this gift for any purpose within the general powers of a charity should be held valid. The authority to accept such a gift was derived from section 2, article 4 of the Code of Public Local Laws, Baltimore City Charter, which provided that it may receive "any other form of gift or conveyance in trust for any general corporate purpose, or in aid of the indigent poor, or for the general purposes of education or for charitable purposes of any description within the said city". This Court held in that case that the City must decide whether it was going to accept the

gift with the condition that it observe the donor's wishes and intention in the purchase, improvement, and equipment of one park with the obligation thereafter to maintain it as "a public park". If the City was not willing to do these things "the devise would fail and the property go to Peabody Institute as residuary devisee". In that case, the testator had a residuary clause in his will. Also in the Peabody case there was no evidence of any change of circumstances which would make the use of the gift impracticable under new conditions which the testator had not contemplated. Also in that case a time limit was provided. Here the gift is in perpetuity. The effect of that decision was therefore, unless the City applied the gift to the condition attached, which was in no way shown to be impracticable, the property would pass under the residuary clause to another beneficiary. This residuary clause covered just such an event as the City had contemplated. There is no such residuary clause in the will here before us.

Of course, one of the fundamental rules of construction is that the intention of the donor must govern if consistent with the rules of law. This intention must be considered from the entire instrument. Judge Delaplaine said in the case of *Sands v. Church, supra,* 181 Md. at page 542, 30 A. 2d at page 775, the following which is applicable here: "The donors did not create an estate on condition. It is a familiar maxim that conditions subsequent are not favored in law, for the breach of such a condition causes a forfeiture, and the law is averse to forfeitures. *4 Kent's Commentaries,* 130. In 1863 Chief Justice Bigelow announced the rule of construction in the Massachusetts Supreme Judicial Court: 'A deed will not be construed to create an estate on condition, unless language is used which, according to the rule of law, *ex proprio vigore,* imports a condition, or the intent of the grantor to make a conditional estate is otherwise clearly and unequivocally indicated.' *Rawson v. Inhabitants of School District No. 5 in Uxbridge,* 7 Allen, Mass., 125, 83 Am. Dec. 670, 672. The Court of Appeals emphasizes that

a deed should not be construed as a grant on condition subsequent, solely for the reason that it declares the purpose for which the granted property shall be used, where such purpose will not inure specially to the benefit of the grantor and his heirs but is general and public in its nature, and where there are no words indicating an intent that the grant is to be void if the declared purpose is not fulfilled. *Kilpatrick v. City of Baltimore*, 81 Md. 179, 194, 31 A. 805, 806, 27 L. R. A. 643, 48 Am. St. Rep. 509; *Faith v. Bowles*, 86 Md. 13, 37 A. 711, 63 Am. St. Rep. 489. It is reasoned that when the language of an instrument does not clearly indicate the grantor's intention that the property is to revert to him in the event it is diverted from the declared use, the instrument does not operate as a restraint upon alienation of the property, but merely expresses the grantor's confidence that the grantee will use the property so far as may be reasonable and practicable to effect the purpose of the grant. *Columbia Building Co. v. Cemetery of Holy Cross*, 155 Md. 221, 228, 141 A. 525, 528. Thus it has been specifically held that a provision in a deed conveying land to a church and indicating the use to which the land is to be applied does not create an estate on condition. *Rydzewski v. Vestry of Grace and St. Peter's Church*, 145 Md. 531, 125 A. 717."

In the case now before this Court it is evident that treatment of contagious diseases has changed substantially since Jennie Beck made her will in 1915. Scarlet fever and diphtheria are by no means as prevalent and severe now as other contagious and infectious diseases mentioned herein. At the time Jennie Beck republished her will by codicil in 1919 the wards were being used for the treatment of all contagious diseases. To restrict the funds alone to treatment of diphtheria and scarlet fever would be making use of a valuable thing to accomplish too small a purpose. It is also very evident from the testimony in the case that open wards are not now suitable for the treatment of contagious and infectious disease. To restrict the use to open wards at this time

would certainly not carry out the intention of the testatrix. Wards I and III have been remodeled and converted to other uses. To change them back to their former status would be a waste of the funds generously bequeathed by the testatrix. As to the direction in her will restricting the fund "to pay for the care and treatment of deserving free patients in said Contagious Units to the end that two-thirds of the number of beds in each of two wards of said Contagious Units shall be used for the reception, care and treatment of free patients", the words *"to the end"* simply represent the goal to be reached by the Home. This gift to the Home by the testatrix is a permanent endowment in perpetuity. The testatrix, who was evidently an intelligent woman, must have known that the stated purposes in her will could not be carried out forever in the literal manner as prescribed. However, she made no "gift over". The wording of the will was a matter of instruction and means to an end, not a condition subsequent. The will certainly does not show any intention on her part that the gift was to be less useful to humanity than at the time she bequeathed it, or that she had any intention for her heirs to take the bequest at any time in the future. In fact, by her codicil she made a bequest of $5000.00 to Jennie M. Gray, appellant, after the death of William C. Beck, from the corpus of the trust estate and the "invested income."

It is evident that the testatrix meant to help the Home, not to hamper it. She intended to promote the interest and well-being of the Home. She was very much interested in the progressive care of children. She must have known that change in economic conditions and change in medical care would greatly affect a gift and endowment in perpetuity. She could, if she had so desired, have made her stated purposes mandatory. She could have included in her will a forfeiture clause or "gift over" in the event the Home did not strictly comply with the will, or she could have specifically said that the stated purposes were mandatory. She did not do so. There is no residuary clause in this will as in the case

of *Mayor & City Council of Baltimore v. Peabody Institute, supra,* relied on by Jennie Beck Gray.

We are of opinion, as contended by the Home, that the express purposes in the will of the testatrix (other than the provision that the corpus be held as an endowment fund and only income therefrom used) are not conditions subsequent and are not mandatory under the changed circumstances in the treatment of diseases and the physical outlay of the Home. As we have hereinbefore stated, this is a gift in perpetuity. She could not have intended that Wards I and III be used in perpetuity physically as they were at the time of her death, regardless of the advancement in medical science and building construction. It was the over-riding purpose of the testatrix to benefit children with serious contagious and infectious diseases. As contended by the Home, it should not be handicapped in carrying out the purposes of the Home by making it adhere to specific uses mentioned in the will, which on account of changed conditions, both from a medical and economical standpoint, are no longer practicable. Such would not be practical, economical, or fulfill the general intention of the testatrix.

We therefore find that the corpus of the endowment fund (The Jennie Beck Memorial Endowment Fund), shall be kept intact and not used or expended for any purpose whatsoever as found by the chancellor. *Peter v. Carter, supra.* We also find that the income from said endowment fund, less certain expenses as ordered by the Chancellor, and the income and corpus of the "invested income fund" may be invested or reinvested or completely used by the Home in such manner as the Board of Managers shall deem fit and proper to carry out any of the general purposes of the Home in the treatment of free patients.

We see no reason why the sum of $10,257.61 paid by the Home for the services of a social worker should be returned to the "invested income fund", as in our opinion this money was used to carry out the general purposes of the Home. Otherwise the decree will be affirmed. The

272

court costs and counsel fee for the trustee were properly directed to be paid out of the endowment or corpus fund. *Buchanan v. Lloyd*, 64 Md. 306, 313, 314, 1 A. 845, 6 A. 171; *Cotton v. Tyson*, 121 Md. 597, 607, 89 A. 113.

In view of our finding it is not necessary that we pass upon the question whether the agreements signed by William C. Beck released any right, title or interest of the heirs in the funds in question.

Chapter 727 of the Acts of 1945, Article 16, Section 279A of the Code 1947 Supplement, adopting the doctrine of *"Cy Pres"* in Maryland, is not applicable to this case because that statute does not retroactively apply to wills which became effective before the enactment of the statute. *State Tax Commission v. Potomac Electric Power Co.*, 182 Md. 111, 117, 32 A. 2d 382; *Evans v. Safe Deposit & Trust Co.*, 190 Md. 332, 346, 58 A. 2d 649, 656.

The case will therefore be remanded for the passage of a decree to conform with this opinion.

> *Decree reversed in part and affirmed in part, and cause remanded for the passage of a decree to conform with this opinion. Costs to be paid from the corpus of the endowment fund.*