## MILLER ET AL. *v.* MERCANTILE-SAFE DEPOSIT AND TRUST COMPANY, EXECUTOR ET AL.

[No. 143, September Term, 1960.]

*Decided February 24, 1961.*

The cause was argued before HENDERSON, HAMMOND, HORNEY, MARBURY and SYBERT, JJ.

*Carl H. Lehmann, Jr.,* with whom was *George W. Della* on the brief, for the appellants.

*Hilary W. Gans,* with whom was *Charles B. Levering* on the brief, for the Executor, one of the appellees.

*G. Van Velsor Wolf,* with whom were *Thomas C. Clarke* and *Piper & Marbury* on the brief, for the Children's Hospital, Inc., a residuary legatee and appellee.

*Robert W. Williams,* with whom were *J. Rieman McIntosh* and *Ober, Williams, Grimes & Stinson* on the brief, for the James Lawrence Kernan Hospital and Industrial School of Maryland for Crippled Children, Inc., also a residuary legatee and appellee.

Submitted on brief by *John C. Kump* and *Paul J. Yeager* for the General German Orphan Association of the State of Maryland, Inc., the other residuary legatee and appellee.

HORNEY, J., delivered the opinion of the Court.

The Circuit Court of Baltimore City decreed that the re-

siduary clause of the last will and testament of George J. Heuter, deceased, should be construed cy pres [1] and his nephews, who were next of kin and only surviving heirs at law, appealed.

The bill to construe the will and for instructions as to the manner in which the residuary estate should be distributed was filed by the Mercantile-Safe Deposit and Trust Company as executor under the will, against William H. Miller and Walter Miller, the nephews, and all other parties who had or might have "any interest in the residuary estate." The chancellor adopted the findings of fact and conclusions of law of the master-examiner to whom the proceeding had been referred for a report, decreed that the three remaining residuary legatees (all of which were charitable institutions) were entitled to receive all of the residuary estate, including the part which would have been distributable to the fourth named charitable institution had it not ceased functioning, and ordered the executor to pay and distribute the whole residue "in equal shares to and among" such remaining residuary legatees.

There was no substantial controversy with respect to the facts and circumstances. The will, executed on October 19, 1944—after bequeathing insignificant cash legacies out of an estate of more than $200,000, to certain named beneficiaries, including $500 to nephew William (and his wife) and $50 to nephew Walter—provided:

> "I give, devise and bequeath all the rest, residue and remainder of my estate and property of every kind and character, together with any one or more of the * * * legacies that might lapse by reason of the death of any one or more of the * * * named beneficiaries, unto and to the four following named institutions in even and equal shares; to wit:
> The General German Orphans Home of Baltimore City * * *;

---

1. The term "cy pres" or "si pres," which is Norman French for "so near," was taken from the phrase "si pres comme possible" meaning "so nearly as may be."

The United Patriotic Orphans Home[2] * * *;
The James L. Kernan Hospital and Industrial
School for Crippled Children * * *; and
The Childrens Hospital School * * *."

The will also contained an *in terrorem* clause warning his relatives that if any of them should contest the will, their legacies would be forfeited and fall into the residuary estate.

On November 20, 1946, a codicil to the will reduced the legacy to nephew William (and his wife) from $500 to $50 and repeated the warning as to possible forfeiture. In a separate notation the testator (in his own handwriting) again limited the bequest to fifty dollars "and absolutely no more for very good and sufficient reasons." He further noted on the margin of the will opposite the original bequest of $500 that the change was "made for good reasons." Later the testator addressed another note to his executor and requested that the message he enclosed therein be delivered with the bequests to his relatives. In effect the message suggested to "The Miller Family" that during their leisure moments they should consult their conscience and concentrate on the selfish and rude treatment they had given him since it might "stimulate a little food for thought." He further suggested that they ponder over their discourteous and "ignoring attitude" and their "hurtful expressions and actions of the past" which he "had to endure and accept with considerable sadness." In still another note to the scrivner of his will before it was finally prepared, he advised him that he had decided to 'add the Childrens Hospital Home to the other three charitable institutions since it too was a "worthy one," thus making the will provide for an equal division "among the four homes instead of three."

When the will and codicils were executed, the United Patriotic Home was operating within its corporate charitable purposes, but financial difficulties caused the officers and directors of the institution to liquidate and distribute all of its assets to other charities, principally the Lutheran Hospital of

---

2. According to the bill the correct corporate name was "The United Patriotic Home for Protestant Orphaned Children of Baltimore City."

Maryland. The charter of the home was forfeited as of October 31, 1952, for failure to file reports.

The testator died on June 7, 1958.

The Millers, claiming that the one-fourth part of the residuary estate bequeathed to the United Patriotic Home should have been distributed to them, contend (i) that the cy-pres statute (Code [1957], Art. 16, § 196), is not applicable to the situation presented by this case; and (ii) that even if the cy-pres doctrine is otherwise applicable, the bequest is void because there has been no showing of the "general charitable intention" the statute requires.

(i)

The first contention—that the statute is not applicable—is divided into two parts: one is that since the bequest did not vest in the named charitable institution cy pres cannot be applied; and the other is that the application of cy pres by the chancellor was prerogative and not judicial as contemplated by the statute. The statute is clearly applicable and the application of cy pres was judicial.

The enforcement of charitable trusts in this State, and perhaps the application of the doctrine of cy pres, was denied for more than a century. As was pointed out in *Fletcher v. Safe Deposit & Trust Co.,* 193 Md. 400, 67 A. 2d 386 (1949), and again in *Loats Female Orphan Asylum v. Essom,* 220 Md. 11, 150 A. 2d 742 (1959), this situation was the result of the rejection by this Court of the statute of charitable uses (43 Eliz., ch. 4) in *Dashiell v. Attorney General,* 5 H. & J. 392 (1822).

What is now Code (1957), Art. 93, § 357, originally enacted in 1888, stipulated that no devise or bequest for a charitable use should be void by reason of the uncertainty of the beneficiaries, provided the will making the gifts contained directions for the formation of a corporation to receive and administer the devise or bequest. And in 1931, what is now Code (1957), Art. 16, § 195, was enacted to remove objections to charitable trusts on the basis of the rule against perpetuities and the indefiniteness of beneficiaries. This statute, which expressly amended the century-old ruling of this Court

with respect to the enforcement of charitable trusts, was applied seven years later in *Rabinowitz v. Wollman,* 174 Md. 6, 197 Atl. 566 (1938), where it was held that the residuary devise, to "such religious, charitable, scientific, literary or educational" corporations as the executors should select, was valid. The question of whether or not § 195, *supra,* empowered the courts to apply cy pres [3] is purely academic insofar as this case is concerned since the will construed herein took effect after the enactment of the Uniform Charitable Trusts Administration Act, usually referred to as the cy-pres statute, which we will now consider.

Chapter 727 of the Acts of 1945 (the uniform act referred to above), now codified as Code (1957), Art. 16, § 196, definitely conferred cy-pres power on the courts of this State.[4] The statute in pertinent part provides:

> "[I]f a * * * bequest for charity, at the time it was intended to become effective, is illegal, or impossible or impracticable of enforcement, and if the * * * testator manifested a general intention to devote the property to charity, a court of equity may, on application of * * * any interested person, or the Attorney General of the State, order an administration of the * * * bequest as nearly as possible to fulfill the general charitable intention of the * * * testator."

As we read it, the statute was intended to and did provide a method by which charitable bequests that had failed might be distributable "as nearly as possible" in a manner that would carry out the intention of the testator. It would

---

3. Bogart, *Trusts and Trustees,* § 433, thought the statute (§ 195 of Art. 16) was broad enough to confer cy pres, but Howard, *Charitable Trusts in Maryland,* 1 Md. L. Rev. 105, 125 (1937), did not. See also Fisch, *The Cy-Pres Doctrine in the United States,* § 2.01(c).

4. The preamble of the bill read in part as follows: " * * * giving statutory recognition to the doctrine of 'Cy-Pres' in construing charitable bequests * * *." See also *Polster's Estate v. Com'r of I. R.,* 274 F. 2d 358 (1960), where it is said that § 196 (of Art. 16) had the effect of adopting the principle of cy pres in its entirety.

seem therefore that the fact the bequest did not vest in the United Patriotic Home is immaterial.

In 2A Bogart, *Trusts and Trustees*, § 431, it is said:
"[Cy pres] is the principle that equity will, when a charity is originally or later becomes impossible or impracticable of fulfillment, substitute another charitable object which is believed to approach the original purpose as closely as possible. It is the theory that equity has the power to mould the charitable trust to meet emergencies."

Furthermore, cy pres is as applicable to an absolute bequest to a charitable corporation as it is to a bequest in trust. Bogart, *ibid.;* Fisch, *The Cy-Pres Doctrine in the United States,* § 5.01 (a) ; *Rabinowitz v. Wollman, supra.*

The text writers and the cases also make it clear that cy pres will be applied when the intended beneficiary ceases to exist before the effective date of the devise or bequest. See Restatement 2d, *Trusts,* § 399, Comment o [if a testator bequeaths property to a charitable corporation which is not in existence the bequest does not fail] ; 4 Scott, *Trusts,* § 397.3 [where a charitable corporation is not in existence "the disposition will not fail"]. See also Bogart, *op. cit., supra,* § 432.

It would be difficult to find a case squarely within the terms of the cy-pres statute if this one is not. The testator made a *bequest for charity* to the United Patriotic Home. At his death, when the bequest *was intended to become effective,* the institution had ceased to exist and the *bequest was impossible of enforcement.* We think it is apparent that the statute is applicable to the situation in this case, if, of course, the testator manifested a general intention to devote the property thus bequeathed to charity.

The second part of this contention—that the application of cy pres was prerogative and not judicial needs little comment. The parties agree that the statute in question (§ 196 of Art. 16) confers a *judicial* and not a *prerogative* power on the courts. And, though the difference between the two may not always have been clear,[5] we think the application of the doctrine in this case was judicial.

---

5. Howard, *op. cit., supra,* at p. 125 (of 1 Md. L. Rev.).

In section 432 of his work on Trusts and Trustees, Professor Bogart describes the judicial power of cy pres as that which is exercised by the courts and is "[a]lmost always based on the existence of a charitable trust or an absolute gift to a charitable organization," and states that the prerogative power of cy pres is used—by analogy to the exercise of royal power by a king—"[w]here there is a gift for charity, without a trust, or an absolute gift to a charitable society." Later in the same section he points out the distinction beween the early and modern concepts of how the cy pres power was applied, thus:

> "Some early cases were inclined to hold that the prerogative power was necessary in order to dispose of property, where the donee named by the testator was a charitable institution which never existed, or which had gone out of being before the testator died. * * * The more modern cases, however, take a different view. They are nearly all cases of outright gifts to a nonexistent charitable institution, with no mention of a trust, in which the court applies the cy pres power and turns over the property to another charitable institution outright, or sets up a trust for its administration, after a report by a master."

The type of cy pres applied by the chancellor in this case was clearly *judicial* and not *prerogative*.

### (ii)

Since the testator must have "manifested a general intent to devote the property to charity" before cy pres is applicable, there remains the final question of whether there was in fact sufficient evidence of a "general charitable intention" to justify application of the doctrine in this case. While there are no hard and fast rules to determine when the intent of the testator is general or specific, we think it is clear that the chancellor was correct when—by adopting the report of the master-examiner—he concluded that the testator had manifested a general charitable intent within the meaning of the cy-pres statute.

In the first place, the fact that the testator bequeathed practically all of his estate for charitable purposes, is sound evidence denoting a general charitable intent. *Wendell v. Hazel Wood Cemetery,* 67 A. 2d 219 (N. J. Super. 1949); *In Re Stouffer's Trust,* 215 P. 2d 374 (Ore. 1950); *Ministers & Missionaries, Etc. v. Meriden Tr. & S. D. Co.,* 94 A. 2d 917 (Conn. 1953); *In Re Scott's Estate,* 145 N. Y. S. 2d 346 (Surr. Ct. 1955); *In Re Bowne's Estate,* 173 N. Y. S. 2d 723 (Surr. Ct. 1958). The *Wendell* case even went so far as to suggest that there is no better evidence of a general charitable intent than a virtual total giving to charity. See also *Christian Herald Ass'n v. First Nat. Bank of Tampa,* 40 So. 2d 563 (Fla. Supr., Div. B, 1949); *Town of Brookline v. Barnes,* 87 N. E. 2d 843 (Mass. 1949); *Ramsey v. City of Brookfield,* 237 S. W. 2d 143 (Mo. 1951); *In Re Faulkner's Estate,* 275 P. 2d 818 (Cal. App. 1954); *In Re Lee's Will,* 156 N. Y. S. 2d 813 (Sup. Ct. 1956); *Hardy v. Davis,* 148 N. E. 2d 805 (Ill. App. 1958); Bogart, *op. cit., supra,* § 436.

Also, the testator bequeathed the whole of the residue of his estate to charity, and this is a strong indication that his intent was general and not specific. *Rhode Island Hospital Trust Co. v. Williams,* 148 Atl. 189 (R. I. 1929); *Kentucky Childrens Home v. Woods,* 157 S. W. 2d 473 (Ky. 1941); *In Re Stouffer's Trust, supra,* (Ore. 1950); *Union M. E. Church v. Equitable Trust Co.,* 83 A. 2d 111 (Del. Ch. 1951); *Hardy v. Davis, supra,* (Ill. App. 1958). In the *Hardy* case it was held that though testamentary provisions for a number of specific charities do not always show general charitable intention, the very existence of such charitable gifts is some evidence of a general charitable purpose and intent.[6] See also *Citizens & Mfg'rs Nat. Bank v. Guilbert,* 186 Atl. 564 (Conn. 1936); *Powers v. Home for Aged Women,* 192 Atl. 770 (R. I. 1937); and *In Re Knox* [1937], Ch. 109, an English case.

The absence of a gift over is another indication of a gen-

---

6. It should be noted that the decision in this case (Hardy v. Davis) seems to have "toned down" considerably the effect of the earlier decisions in *Quimby v. Quimby,* 175 Ill. App. 367 (1912), and in *Chicago Daily News F. A. F. v. Kerner,* 305 Ill. App. 237

eral charitable intent and that cy pres is applicable. *Town of Brookline v. Barnes, supra* (Mass. 1949); *Worcester County Trust Co. v. Grand Knight,* 92 N. E. 2d 579 (Mass. 1950); *Petition of Lewis Pierce,* 136 A. 2d 510 (Me. 1957). See also *Town of Milton v. Attorney General,* 49 N. E. 2d 909 (Mass. 1943); *First National Bank v. Elliott,* 92 N. E. 2d 66 (Ill. 1950); *First National Bank v. King Edward's Hospital Fund,* 117 N. E. 2d 656 (Ill. App. 1954); *Hardy v. Davis, supra* (Ill. App. 1958); Bogart, *op. cit., supra,* § 436; Fisch, *op. cit., supra,* § 5.03 (a). And see the reasoning in *Gray v. Harriet Lane Home,* 192 Md. 251, 64 A. 2d 102 (1949).

Furthermore, the presence of the *in terrorem* clause is evidence of a general charitable intent, Scott, *op. cit., supra,* § 399.2; as is the fact that the testator bequeathed the residue of his estate to charities having the same general purpose of providing homes, schools and hospitals for orphaned, crippled and other unfortunate children. *Ramsey v. City of Brookfield, supra* (Mo. 1951).

From these factors and the fact that the testator was apparently not specifically interested in any of the named charitable institutions other than that they were "worthy" ones, we conclude that the finding of a general charitable intent was proper.

For the reasons assigned the decree will be affirmed.

> *Decree affirmed, the appellants*
> *to pay the costs.*

---

(1940), with respect to the weight to be attached to a large and varied number of charitable gifts.