THE WESLEY HOME, INC., ET AL. *v.* MERCANTILE-
SAFE DEPOSIT AND TRUST COMPANY,
Surviving Trustee u/w of Virginia Van
Rensselaer Jacques ET AL.

[No. 239, September Term, 1971.]

*Decided April 4, 1972.*

The cause was argued before HAMMOND, C. J., and MCWILLIAMS, SMITH and DIGGES, JJ., and ROBERT F. SWEENEY, Chief Judge of the District Court of Maryland, specially assigned.

*Albert S. Barr, III,* and *G. Van Velsor Wolf* with whom were *Piper & Marbury* on the brief, for appellants The Wesley Home, Inc., and The Home For Incurables of Baltimore City.

*Carlyle Barton, Jr.,* with whom were *Barrett W. Freedlander* and *Guy B. Brown* on the brief, for appellants Mary Houston Dickey, etc. et al.

*J. Cookman Boyd, Jr.,* with whom were *Frank M. Benson, Jr.* and *Rob Ross Hendrickson* on the brief for appellees The Young Men's Christian Association of Greater Baltimore Area and The Anchorage of Baltimore City.

No brief filed for appellee Mercantile-Safe Deposit and Trust Co., surviving trustee u/w of Virginia Van Rensselaer Jacques, deceased.

SWEENEY, J., delivered the opinion of the Court.

This is an appeal from a decree of the Circuit Court of Baltimore City (Perrott, J.), filed June 24, 1971, in an action instituted by Mercantile-Safe Deposit and Trust Company, sole surviving trustee under the Will of Virginia Van Rensselaer Jacques, deceased.

The events culminating in the present appeal began on August 11, 1911, when Mrs. Jacques died leaving a Will that had been executed on February 11, 1911. The first four paragraphs of the Will contained certain specific bequests, not of interest here. The fifth paragraph created a trust, and it is the disposition of a portion of

the residue of the trust fund which is now at issue. The pertinent portion of the Will is as follows:

"5. All the rest and residue of my estate, real, personal and mixed, and wheresoever situated, I give, devise and bequeath unto the 'Safe Deposit and Trust Company of Baltimore' and JAMES M. JACQUES and the survivor of them, their successor or successors in the trust, in special trust and confidence, nevertheless, to collect and receive the issue, rents and income thereof, and after paying the taxes and necessary expenses thereon, to divide the net income into six equal parts.

"Three-sixths or one-half of said net income I hereby direct to be paid unto my beloved husband, JAMES M. JACQUES for and during his natural life: One-sixth of said net income I direct to be paid to my daughter-in-law, MARY R. LLOYD, for and during her natural life: One-sixth of said net income, I direct to be paid unto my granddaughter, GERTRUDE LLOYD, for and during her natural life: One-sixth of said net income, I direct to be paid unto my granddaughter, CLARISE ALVA CRAWFORD, for and during her natural life. And from and after the death of any of the said JAMES M. JACQUES, MARY R. LLOYD, GERTRUDE LLOYD and CLARISE ALVA CRAWFORD, I hereby direct that after and as each of them shall die that the share of the income which would have been paid to the deceased, if living, shall be added to and become a part of the corpus or principal of said trust fund until said trust shall cease as hereinafter provided; and from and after the death of the survivor of all of said JAMES M. JACQUES, MARY R. LLOYD, GERTRUDE LLOYD and CLARISE ALVA CRAWFORD, the said trust shall cease and the corpus or principal of the trust fund, as

then constituted, shall be divided by said Trustees into two equal parts; one part or one-half of said trust fund, I give, devise and bequeath unto 'The Hospital for the Women of Maryland of Baltimore City' and the 'City Hospital of Thomasville', Georgia, share and share alike.

"The other one part or one-half of said trust fund I give, devise and bequeath unto 'The Anchorage of Baltimore City', 'The Home of the Aged of the Methodist Episcopal Church of Baltimore City' and the 'Home for Incurables of Baltimore City', share and share alike."

The last surviving life tenant died on April 24, 1967, and the trust thereupon terminated.

No controversy exists at present pertaining to that part of the residue which was to be distributed between the two hospitals, and two of the three charities designated to take under the second part of the trust fund are clearly entitled to their share, and have been paid. A dispute exists, however, as to whether the other named charity, The Anchorage of Baltimore City (Anchorage), is entitled to receive its allotted share. The heirs at law of the testatrix allege that the Anchorage has, in fact, ceased to exist, and that an intestacy results as to its portion of the trust estate. They urge that the sum allotted to the Anchorage should, therefore, be paid to the executors of the Will, for the benefit of the heirs. The other two charities named to share in that portion of the trust: The Wesley Home, Inc., formerly The Home of the Aged of the Methodist Episcopal Church of Baltimore City (Wesley), and The Home for Incurables of Baltimore City, also known as The Keswick Home (Keswick), join the heirs in urging that the share in question not be paid to the Anchorage, but argue that it should be divided between Wesley and Keswick.

The Anchorage asserts that it is still legally in being and entitled to receive its designated share, for transmission to the Young Men's Christian Association of the

Greater Baltimore Area (YMCA) under the terms of an agreement to be discussed in further detail later herein.

To resolve this dispute, Mercantile-Safe Deposit and Trust Company, surviving trustee under Mrs. Jacques' Will (Mercantile), filed its bill of complaint, seeking a determination as to which of the various claimants were entitled to take and in what amounts. By his Decree, the judge below found that the Anchorage and its successor-assignee, the YMCA, were entitled to receive the money in question. From that Decree the other claimants have taken this appeal.

In order to understand the background of the present dispute, a review of the history of the Anchorage would appear to be in order.

The Anchorage was incorporated on February 20, 1908 for the stated purpose of ". . . maintaining under Christian influence a boarding house and Home for Seamen while in port, and any other work for them that may grow out of it, to aid and uplift the men of the sea . . .". The Charter was duly recorded among the chattel records of Baltimore City in Liber S.C.L. 48, folio 208.

Staffed by both paid and volunteer personnel, including the voluntary services of the testatrix on an occasional basis in the several years prior to her death, the work of the Anchorage was conducted in a building owned by the Corporation on Thames Street in Baltimore City. For approximately twenty years the organization functioned without major difficulty, although apparently with continuing financial pressures. The record reveals that the institution was, indeed, a haven for seamen and a source of great assistance to them. The principal activity of the Anchorage consisted of providing lodging and meals, at reasonable rates, to seamen in port, but it also extended into such other humane areas as visiting sick sailors in local hospitals; visiting and attempting to secure the release of seamen incarcerated in jail, and seeking employment for seamen by working in coopera-

tion with shipping companies and labor unions. No charge was made for the latter services.

The organization was also active in attempting to locate missing seamen, and even conducted funeral services for those who died in port, burying them, when necessary, in a plot located in Parkwood Cemetery.

The record reveals the extent of the Anchorage's activities by indicating that 45,955 seamen were entertained in the Thames Street facility in 1928.

During the decade of the Twenties, faced with the imminent retirement of the Superintendent and with recurring financial problems, the Board of Directors of the Anchorage began negotiations with the YMCA towards the end that the YMCA might take over its operations. Tentative agreement was reached in 1929 and the YMCA assumed management of the Anchorage on July 1st of that year. A contract between the two organizations was finally approved under date of April 17, 1930 and a deed conveying the fee simple property of the Anchorage to the YMCA was executed on April 7, 1932. This deed is recorded in Liber S.C.L. 5294, Folio 492, and was subsequently approved by the Maryland Legislature. It granted to the YMCA:

"[A]ny and all other assets of every kind and description, whether real, personal or mixed, which The Anchorage of Baltimore City may hold title to or possess, *or to which it may be entitled to under any existing will already probated, together with any gifts, legacies or devises which may be given or left to The Anchorage of Baltimore City by will or otherwise at any future time,* it being the intention hereby that The Young Men's Christian Association of Baltimore shall, by this deed, acquire and hold title to all of the assets of The Anchorage of Baltimore City of which it is now seized or of which it now has possession or of which it shall at any time in the future be seized or have possession." (Emphasis supplied)

From 1929 until 1955, the YMCA continued the operation of the Anchorage under the name of "The Seamen's Branch of the Young Men's Christian Association". It appears to be uncontroverted that during this quarter century the YMCA, in every substantial particular, carried on the work formerly conducted by the Anchorage management. Indeed, in 1941, under the auspices of the YMCA, lodgings were provided at the Seamen's Branch for 54,253 seamen, and an additional 151,887 used the premises for some purpose other than lodging. The activities of the Seamen's Branch continued at a high level throughout World War II, but it appears that the end of that war and a variety of other factors brought about a dwindling of the demand for the services of the facility. There was a great decline in the amount of American shipping after the war, and the nature of the Port of Baltimore underwent considerable change in that period. Additionally, there was a substantial change in the life style of merchant seamen, as more were married and had homes of their own, and modern day transportation made it possible for them to return to those homes between assignments. Seamen as a whole were paid higher salaries than they had received before the war, and could afford more elaborate facilities than those offered by the Seamen's Branch. The Thames Street facility was quite old and not in good general condition, and the neighborhood in which it was located had undergone substantial deterioration. The death blow, however, appears to have been dealt when the Community Chest, after a study made by the Council of Social Agencies, withdrew its financial support for the Seamen's Branch of the YMCA's operations.

On February 2, 1955, the Executive Secretary of the Seamen's Branch wrote to the National Council of Seamen's Agencies of the United States and Canada, advising them of the imminent closing of the facility, and the minutes of the meeting of the Board of Managers of the YMCA, dated April 15, 1955, indicate that the branch ceased to operate as of that date.

Even though it turned over to the YMCA title to all its assets and supervision of its operations, the formal corporate existence of the Anchorage was never officially terminated. Although no State or federal reports or returns of any kind have been filed since 1932, three Board of Director's meetings have been held since then, at each of which the only business transacted was the filling of vacancies which had occurred on the Board. The minutes of these meetings show that the reason for maintaining the corporate existence and not forfeiting the Charter of the Anchorage was to avoid any complications with reference to any endowments or legacies which may have been written in wills naming the Anchorage as beneficiary. In fact, in 1934 the Anchorage did receive a legacy (from the predecessor of the present trustee, acting under another will) which, pursuant to adjudication in the Orphans' Court, was paid to the Anchorage and then turned over by it to the YMCA.

Appellants Wesley and Keswick maintain that:

a) The Anchorage has abandoned the performance of the work which Mrs. Jacques sought to perpetuate, and has, therefore, lost its right to participate in the distribution of her testamentary gift, and

b) Wesley and Keswick are entitled to divide between them the share of the trust estate allotted to the Anchorage.

Even assuming, arguendo, the correctness of the first proposition, we find nothing in the law to sustain the second. The testamentary direction was that the proceeds of that part of the trust fund were to be given to the three institutions, "share and share alike". There is no mystery surrounding the meaning of these words. In *Gilpin v. Hollingsworth*, 3 Md. 190, 195, we considered that phrase and said that "[i]n wills the expressions 'equally to be divided,' 'share and share alike,' 'respectively between and amongst them,' have been held to create a tenancy in common"; citing Blackstone's comment that "an estate given to A. and B., *equally to be di-*

*vided* between them, . . . is certainly a tenancy in common;". II W. Blackstone, *Commentaries*, Chap. 12, p. *193. See also *Stein v. Stein*, 79 Md. 464, 468; *Preston v. Clabaugh*, 90 Md. 707, 709; *Horwitz v. Safe Deposit & Trust Co.*, 172 Md. 437; 39 Words & Phrases, *"Share and Share Alike"*.

The majority rule throughout this country is that on the failure of a portion of a residuary trust, the portion so failing does not inure to the benefit of owners of the remaining portions. Annot., 36 A.L.R.2d, 1117. "When the disposition of an aliquot part of the residue itself fails from any cause, that part will not go in augmentation of the remaining part . . . but will devolve as undisposed of." II Jarman, *A Treatise on Wills*, Chap. 23, p. 368 (5th Am. ed). This is the rule in Maryland, stated by this Court in *Church Extension of the Methodist Episcopal Church v. Smith*, 56 Md. 362, 399, where we said:

> "It is equally well settled, that 'where a portion of the residuary bequest fails to become operative at the death of the testator, in the manner provided, the portion thus failing, will not go to increase the other portions of the residuum, as a residue of a residue'. 2 Redfield on Wills, 119."

See also *Curtis v. Maryland Baptist Union, Assn.*, 172 Md. 430; *McElroy v. Mercantile-Safe Deposit & Trust Co.*, 229 Md. 276 (see also p. 291, Prescott, J., dissenting).

Appellants Wesley and Keswick would have us read into the phrase "from and after", as used by the testatrix, an intention on her part to establish a condition subsequent that the trust fund be divided among only those charities which were in existence at the time of the death of the last surviving life tenant. It is a well established rule of testamentary construction that in the absence of some clear manifestation of a contrary intent, or some contravening principle of law, estates will be treated as vesting at the earliest possible moment. *Wilson v. Pichon*, 162 Md. 199; *Grace v. Thompson*, 169 Md. 653; *Curtis v. Baptist Union, supra; Hans v. Safe Deposit & Trust Co.*,

178 Md. 52; *Nicodemus National Bank v. Snyder,* 178 Md. 140.

In *Plitt v. Peppler,* 167 Md. 252, this Court held that where an estate in remainder was devised by name, its vesting should be referred to the time of the testatrix' death, rather than the time appointed for the division of the estate, unless the will clearly indicates an intention that the remainder should not vest until the later period; and in *Boulden v. Dean,* 167 Md. 101, we held that to make estates contingent, there must be plain expression to that effect, or such intent must be so plainly inferable from the terms used as to leave no room for construction. In doubtful cases the interest should be held to be vested, rather than contingent, unless the instrument under consideration will not admit of such construction. Miller, *Construction of Wills,* Sec. 227.

Even in those cases where, unlike the present case, there are apparent conditions or contingencies attached to a gift, we have held that in the absence of a clear reservation of a reversion, what might otherwise be construed as a condition will be regarded merely as the testator's expression of confidence that the property will be used for the intended purpose, insofar as may be reasonable and practicable. *Gray v. Harriet Lane Home,* 192 Md. 257; *Columbia Building Co. v. Cemetery,* 155 Md. 221; *Annapolis v. W. Anna. Fire & Imp. Co.,* 264 Md. 729.

We have frequently considered the question of whether the words "from and after" are sufficient to create a contingent gift, or to indicate an intention to postpone vesting until the time appointed for the division of the estate, and we have held that they are not, unless there is some other expression of limitation or qualification set out or necessarily inferable from the will. In *Williams v. Armiger,* 129 Md. 222, we said, at 233:

> "There are cases holding that words like the words 'from and immediately after' the death of the life tenant express the intention of the testator or grantor to defer the vesting of the re-

mainder until that period. *Larmour v. Rich,* 71 Md. 369; *Poultney v. Tiffany,* 112 Md. 630. But here the words 'from and after' are followed by an express grant to the children Mrs. Johnson 'now has', which show that the grantor intended each of the children of Mrs. Johnson living at the time the deed was executed and delivered to take a *vested remainder,*".

Similarly, in *Cole v. Safe Deposit & Trust Co.,* 143 Md. 90, we construed the words "from and after" to have only the effect of setting out the time of possession, receipt and enjoyment of a previously vested remainder. See also *Tayloe v. Mosher,* 29 Md. 443; *Bailey v. Love,* 67 Md. 592; *Swift v. Cook,* 133 Md. 651.

We hold, therefore, that the words "from and after", as used in the Will at hand, do not express an intent to postpone or defer the time of vesting of the gift. The three institutions designated to divide the second part of the trust estate, Wesley, Keswick, and the Anchorage, were each specifically named by the testatrix and were each *in esse* at the time of her death, and the Will simply does not contain any words which, taken either independently or in connection with the whole document, can be construed as making the bequests contingent or conditional, or divisible only among the charities in existence at the time of the death of the last surviving life tenant. It is but saying the obvious to note that had Mrs. Jacques intended to have her gift paid in that manner, or in any other way sought to limit, qualify, postpone, or defer the vesting of those gifts until some time other than that of her own death, she need merely have so stipulated.

There being no basis on which it can be held that Wesley and Keswick are entitled to divide between them the sum allotted to the Anchorage, we now turn to what we believe is the real question to be decided in this case, i.e., whether the portion of the residuary trust bequeathed to the Anchorage has failed, thereby creating an intestacy redounding to the benefit of the heirs at law (Heirs) of Mrs. Jacques.

The Heirs allege that the Anchorage is ineligible to receive the bequest, claiming it has, de facto, ceased to exist. They dispute the validity of the 1929 agreement between the Anchorage and the YMCA, but say that even if that agreement were valid, the legacy must still fail because the YMCA has discontinued its services for seamen. Such a failure, they contend, results in an intestacy as to that portion of the residue.

One of the strongest presumptions of the law is that where a will contains a residuary clause, every intendment shall be made against there being either a general or partial intestacy. *McElroy v. Mer.-Safe Dep. Co., supra; Holmes v. MacKenzie,* 118 Md. 210, 215; *Ball v. Townsend,* 145 Md. 589, 600; *Lavender v. Rosenheim,* 110 Md. 150, 153. It is a very extraordinary will where a residuary clause does not prevent a partial intestacy, unless some part of the residue, itself, be not well given. Miller, *Construction of Wills,* Sec. 158; *McElroy v. Mer.-Safe Dep. Co., supra; Barnum v. Barnum,* 42 Md. 251, 311; *Holmes v. MacKenzie, supra,* 216. If the residuary clause, itself, does not make a complete disposition of the residuum, the presumption against intestacy is not applicable, and if the words of the will clearly create an intestacy, the court will not fill the void. *McElroy v. Mer.-Safe Dep. Co., supra; Barnum v. Barnum, supra; Henderson v. Henderson,* 131 Md. 308, 313. The portion of the residuary bequest thus failing passes to the next of kin, as property not disposed of by the will. *Church Exten. M. E. Ch. v. Smith, supra; Davis v. Mercantile Safe Deposit & Trust Co.,* 235 Md. 266, 269. See also *Abell v. Abell,* 75 Md. 44, 63; *Henderson v. Henderson, supra,* 314; *Smith v. Baltimore Trust Co.,* 133 Md. 404, 410; Miller, *Construction of Wills,* Secs. 58, 158. And this is the majority rule throughout the country. Annot., 36 A.L.R.2d 1117. Under the facts of this case, and the language of Mrs. Jacques' Will, we agree that if the gift to the Anchorage fails, the Heirs would prevail.[1]

---

1. The provisions of Art. 16, Sec. 196 of the Maryland Code (Chapter 727 of the Acts of 1945), the "Cy Pres" Statute, are not

It is, of course, the cardinal principle of construction of wills that the intention of the testator be carried out, as deduced from the "four corners" of the will. *Ball v. Townsend, supra; McElroy v. Mer.-Safe Dep. Co., supra; Payne v. Payne,* 136 Md. 551; *Marty v. First Nat'l. Bank,* 209 Md. 210; *Davis v. Mer.-Safe Dep. Co., supra;* Miller, *Construction of Wills,* Sec. 9.

Determining the intentions of the testatrix in the case now before us requires no extensive examination of the Will or the record below. Even the Heirs base their claim solely on a result they would have us reach by operation of law, for they candidly admit that the testatrix did not intend to die intestate, and did not intend that they receive the bequest provided for the Anchorage (Reply Brief of Mary Houston Dickey, p. 9). Their admission is fully supported by the Will, itself, in which the testatrix, after making ample provision for her living relatives, indicates her primary intention of leaving a substantial sum to the designated charities, by directing that on the death of any of the four named life tenants, the interest formerly paid to that life tenant was not to be divided among the surviving life tenants, but be added to the corpus—thus augmenting the residuary trust.

It being, we believe, the clear intention of Mrs. Jacques, to provide financial assistance to the several charities named by her, it remains for us to determine whether that intent can be carried out insofar as her bequest to the Anchorage is concerned. *McElroy v. Mer.-Safe Dep. Co., supra.*

In *Inasmuch Gospel Mission, Inc. v. Mercantile Trust Co.,* 184 Md. 231, this Court said, at 239:

> "It is also held that a bequest to a charitable institution does not lapse merely because there are some changes in the institution, as long as

pertinent to the instant case, as the statute is not applicable to wills which became effective prior to its enactment. *Gray v. Harriet Lane Home,* 192 Md. 251; *State Tax Comm. v. Potomac Electric Power Co.,* 182 Md. 111, 117; *Evans v. Safe Deposit & Trust Co.,* 190 Md. 332, 346.

> its general purposes are kept in view by those in control and the institution continues to function in its customary manner. . . . The mere fact that a charitable or educational institution, to which a bequest has been given, is under a different ownership and management from that which the testator knew does not cause a forfeiture of the bequest, especially when the change in operation is for the purpose of insuring continued existence of the institution."

It is not pretended here that the Anchorage continues to function in the manner in which it did during Mrs. Jacques lifetime, nor can it be said that the changes in operation of the Anchorage were for the purpose of insuring the continued existence of the Anchorage as an institution. But we are of the view that the change which has occurred since Mrs. Jacques' death—the agreement with the YMCA—was for the sole objective of sustaining the general purpose of the Anchorage charter, i.e., caring for men of the sea. In the construction and determination of the legal effect of donations to charitable corporations, the objects and purposes for which the charitable institution was incorporated may be considered. That is true, because a gift, donation, or bequest, by name, without further restriction or limitation as to use, to a corporation organized and conducted solely for charitable purposes, may be deemed to have been made for the objectives and purposes for which the corporation was organized. *In re Harrington's Estate*, 151 Neb. 81, 36 N.W.2d 577; *Gray v. Harriet Lane Home*, 192 Md. 257, 271.

The record reveals that both before and after the incorporation of the Anchorage, Mrs. Jacques gave of her time to assist that organization in its work of providing lodging, entertainment, relaxation, and a wholesome environment to merchant seamen while they were in the Port of Baltimore. Her personal familiarity with the work of that organization obviously led to her bequest

for the continuance of that work. There is nothing in the Will, or in the record, to indicate that she made her provision for the Anchorage from any desire to favor the management of the institution; nor are we given any reason to believe that her bequest was brought about by a historical or aesthetic interest in the buildings or equipment used by the Anchorage in carrying on its work. It was, we believe, the welfare of seamen that she desired to promote, and she sought to promote that interest through the organization with which she was best acquainted. We can see no violence done to her intentions by virtue of the Agreement of 1929, under which the YMCA assumed the operation of the Anchorage; for it is abundantly clear from the record that under YMCA auspices, the Seamen's Branch provided more assistance to more seamen than had ever been possible when the Anchorage was operating as an independent agency. We find nothing in the laws of this State in existence at the time of the YMCA-Anchorage Agreement, and nothing in the charters of either organization, which would make the contract between them invalid or improper. The arrangement was in accord with the stated purposes of each of the organizations, and was obviously for the benefit of the community as a whole. We find it to be in compliance with, rather than in violation of Article 23, Section 9 of the Annotated Code of Maryland (1924 ed.).

The argument of Appellees Anchorage-YMCA is somewhat paradoxical, as, in support of their right to receive the bequest, they present two separate propositions, which are to a considerable extent contradictory.

They first assert that the gift to Anchorage became fully and unconditionally vested on the death of Mrs. Jacques, was, therefore, alienable, and the deed assigning that bequest to the YMCA was valid and binding. If we accept this argument, then YMCA is now entitled to receive that bequest in its own right, possibly to use for its own purposes without regard to the interest of seamen. But as their second proposition, they assert that the Anchorage continues in existence and is legally viable

and capable, through the YMCA as its agent, of receiving the bequest and applying it to the purposes for which the Anchorage was incorporated.

Taken independently, there is much to support each proposition. If we were required to decide this case on the sole basis of the absolute right of the YMCA to take this legacy, as the assignee of the Anchorage, it is quite possible that we would do so. But, considering these two propositions as alternatives and mindful of the duty of this Court to give effect, if possible, to the intention of the testatrix, we believe it incumbent on us to give primary consideration to the second alternative.

All parties to this case concede that the Anchorage has never forfeited its charter and maintains, at least, a skeletal legal existence. The record reveals that at least three meetings of the Board of Directors have been held since the agreement with YMCA was finalized in 1932, the most recent meeting having been held in 1969. Appellees Anchorage and YMCA admit that the sole purpose of keeping the Anchorage "alive" was to assure that this and similar bequests to the Anchorage be paid over to the YMCA. That this is a tenuous existence, we do not deny; but in that the breath of life was sustained in order to assist the YMCA in continuing to provide care for seamen, we find it to be sufficient. We are also persuaded that the YMCA is, today, providing the essential services for merchant seamen that Mrs. Jacques sought to perpetuate by her gift. It is true that since the closing of the Seamen's Branch in 1955, the YMCA has not provided any services for seamen as such, nor operated any special facility for seamen. It is also true that there is kept no record of which of the beneficiaries of the services of the YMCA are seamen. But it is conceded that a seaman, wanting clean and inexpensive lodgings, will find a welcome for him at the YMCA. It is also undisputed that seamen will find at the YMCA recreational facilities of a wholesome nature, exceeding in many instances those which were available to him at the Anchorage. It is also beyond dispute that the YMCA, al-

though open to people of every religion, is under "Christian Influence", in keeping with the stated purpose of the Anchorage, as set out in its Charter.

Further proof of the fact that the YMCA did not abandon its interest in the welfare of seamen when it closed the Seamen's Branch is provided by the fact that on the day the doors of the Seamen's Branch were closed, a sign was posted on the Thames Street premises, directing seamen to go to the YMCA for assistance.

On that same day, April 15, 1955, a lengthy memorandum was sent to all of the desk clerks and other staff members of the YMCA by the Executive Secretary, the subject of which was "Certain Seamen's Branch Responsibilities to be Handled by Central Branch after April 15, 1955". The test of that memorandum states that "Central Branch Y.M.C.A. is glad to render such service as it can to those persons who formerly used the Seaman's Branch." There followed specific directions for providing care for seamen, in the matter of dormitory rooms, free rooms, free meals, cash aid, banking and mail. To be sure, the memorandum provided that in most of the above categories, the seaman would be treated no differently than non-seamen, but we will not disqualify the Anchorage-YMCA interest from sharing in the Jacques bequest merely because they provided assistance to everyone, and not seamen alone.

Mrs. Jacques intent was to provide aid for seamen, and that is being provided; not in the manner or place with which she was familiar, but in the best manner available under the changing conditions which have occurred in Baltimore City and in the Merchant Marine in the sixty-one years since her death.

Captain Horace C. Jefferson, Chairman of the Curtis Bay Towing Company, and long experienced in the Port of Baltimore, testified below that there was no longer a need in the Port for the specialized services that had been provided by the Anchorage. He said that any facility available to a group of men would serve a useful purpose for seamen as well as others, and need not necessar-

ily be actually situated on the water front. Not only does the Central Branch of the YMCA appear to be the type of facility for which Capt. Jefferson saw a need, but the Dundalk Branch of the YMCA, near the busy Dundalk Marine Terminal, is particularly well situated to provide lodging and recreational facilities for seamen. The Maryland Port Authority shares that view, for it annually inquires of that Branch as to the services available, so it may refer seamen to it, and the record also reveals that one steamship company has an agreement with the Dundalk Branch whereby it pays for the accommodations at that facility for oriental seamen in the Port.

In *Gray v. Harriet Lane Home,* 192 Md. 251, the testatrix provided that at the death of her brother the corpus of her trust estate was to be paid to the Harriet Lane Home, as an endowment fund for the use and benefit of two wards for the treatment of contagious diseases. Subsequent to her death, the use of such wards was discontinued. The Home contended that the use of wards in such cases was no longer medically desirable. The Executrix, niece of the testatrix, urged that the home be required to reopen and maintain the wards, as a condition of the gift. This Court held that the directions of the testatrix were not mandatory, and said, at 271:

> "She could not have intended that Wards I and III be used in perpetuity physically as they were at the time of her death, regardless of the advancement in medical science and building construction. It was the overriding purpose of the testatrix to benefit children with serious contagious and infectious diseases. As contended by the Home, it should not be handicapped in carrying out the purposes of the Home by making it adhere to specific uses mentioned in the will, which on account of changed conditions, both from a medical and economical standpoint, are no longer practicable. Such would not be practical, economical, or fulfill the general intention of the testatrix."

See also *Loats Asylum v. Essom,* 220 Md. 11; *Gordon v. City of Baltimore,* 258 Md. 682.

By that same reasoning, we find in the case at hand that it was Mrs. Jacques over-riding purpose to benefit merchant seamen, and we do not believe she ever intended to require the Anchorage to maintain its Thames Street premises, or to otherwise operate forever as it did at the time of her death. We find that the Anchorage remains today a valid legal entity; that the agreement between the Anchorage and the YMCA is consistent with the Anchorage's stated objective of "maintaining under Christian influence a . . . Home for Seamen while in port . . .", and that the present day services of the YMCA substantially fulfill that general purpose. We hold, therefore, that the court below was correct in directing the Trustee to pay over to the Anchorage for transmission to the YMCA, the funds in question.

In its Decree, the court below retained jurisdiction for the limited purpose of determining that the intent of the testatrix is carried out by the assignee, the YMCA. We are not told the specific intention of the YMCA in using the monies it will receive from the Jacques Estate, but it is indicated at page 29 of the Brief of Appellees YMCA and Anchorage, and was indicated to us at oral argument, that the funds from the Jacques legacy will be utilized for the particular benefit of seamen. Such use would fully comply with the intentions of the testatrix, and we believe it most appropriate that the court below retain jurisdiction for that purpose.

> *Decree affirmed.*
> *One-third of the costs to be paid by the Anchorage; one-third by Keswick and one-third by Wesley.*