WASHINGTON HOSPITAL CENTER
HEALTH SYSTEM, Appellant,

v.

The RIGGS NATIONAL BANK OF
WASHINGTON, D.C., et al.,
Appellees.

No. 89–1039.

District of Columbia Court of Appeals.

Argued April 4, 1990.
Decided May 23, 1990.

Michael F. Curtin, with whom Claudia A. Pott, Washington, D.C., and Meredith B. Trim, Arlington, Va., were on the brief, for appellant.

Michael H. McConihe, Washington, D.C., for Washington Home and Hospice f/k/a Washington Home for Incurables, with whom E. Tillman Stirling, Washington, D.C., for Riggs Nat. Bank, Richard O. Duvall, Washington, D.C., for Children's Hosp. and Charles H. Burton, Bethesda, Md., for Cent. Union Mission, were on the brief, for appellees.

Before ROGERS, Chief Judge, and NEWMAN and FARRELL, Associate Judges.

ROGERS, Chief Judge:

The issue in this appeal is whether the trial court erred in granting summary judgment to appellees on the ground that Garfield Memorial Hospital was divested of a residuary bequest as a result of its dissolution in 1962 prior to the death of all life tenants under the Will of R. Ross Perry, Jr. Riggs National Bank of Washington, D.C., trustee of the trust, petitioned for a declaratory judgment that the bequest to Garfield must "fail to take effect," and should be divided among the other five charitable institutions entitled to the residue of the trust following the death of the last life tenant.[1] The trial judge ruled that although the gift to Garfield Memorial Hospital had vested at the time of the testator's death, in 1953, the language of the Will, providing that if a gift shall "fail to take effect," then the failed gift shall be distributed to the other named legatees, operated as a divesting provision, and not as an anti-lapse provision, when Garfield Memorial Hospital was dissolved in 1962 after joining the Central Dispensary and Emergency Hospital and the Episcopal Eye, Ear and Throat Hospital in 1958 to form the Washington Hospital Center Health System.[2] We reverse.

I

The facts are undisputed. Under Item VII of his Last Will and Testament (Will) executed May 24, 1941, R. Ross Perry, Jr., a skilled attorney experienced in the law of trusts and estates, left all of the residue and remainder of his estate to Riggs, in trust, and instructed Riggs to establish four equal trust estates for the benefit of certain life tenants. Item VII clause (c) provided that upon the termination of each life estate, or "in the event any of them shall fail to take effect," Riggs was to pay three specific bequests. Finally, under clause (D) of Item VII(c):

> The residue of the said trust estates shall be paid over in equal shares, without priorities, to the Children's Hospital of Washington, D.C., a Corporation; the Garfield Memorial Hospital of Washington, D.C., a Corporation; the Central Dispensary and Emergency Hospital of Washington, D.C., a Corporation; the Washington Home for Incurables, of Washington, D.C., a Corporation; the Instructive Visiting Nurse Society, of Washington, D.C., a Corporation, and the Central Union Mission of Washington, D.C., a Corporation. *Should any of the bequests in this clause (D) fail to take effect, I direct that the same be equally divided among the other legatees of this clause (D) of my will.* I direct my said Trustees to make payments on the said bequests as soon and often as practicable and not to wait until it has the entire amount necessary to pay any bequest ... [emphasis added].

At the time of the testator's death in 1953 Garfield Memorial Hospital (Garfield) was a fully operational corporation. In 1958, Garfield conveyed all of its real property to the federal government and the balance of its assets to WHC. This occurred pursuant to a 1952 agreement between Episcopal Eye, Ear and Throat Hospital (Episcopal), the Central Dispensary and Emergency Hospital (Emergency), Garfield, and the United States whereby the three hospitals, desirous of participating in the hospital center mandated by federal law, were to transfer their activities to the new WHC and, in return for the land and buildings owned by the charitable non-profit corporations, the government, as directed by Pub.L. 79–648, 60 Stat. 896 (August 7, 1946), would construct, "in order to assist in providing more adequate hospital facili-

1. Appellees are Riggs National Bank of Washington, D.C., and the named residuary legatees, other than Garfield Memorial Hospital, under the Will, Children's Hospital, Central Union Mission and Washington Home and Hospice, f/k/a Washington Home for Incurables. For ease of reference we refer to appellees as Riggs.

2. In July, 1982, Washington Hospital Center changed its corporate name to the Washington Hospital Center System, which subsequently became the Washington Healthcare Corporation in July, 1983. The Washington Hospital Center Corporation is a wholly-owned subsidiary of the Washington Healthcare Corporation. In this opinion we refer to these entities as WHC.

ties in the District of Columbia," a building to be used by WHC for general hospital purposes.[3] Following the transfer of its activities and assets to WHC, Garfield petitioned for and was granted corporate dissolution in 1962. *In re Garfield Memorial Hospital,* CA 1412–62 (D.D.C. August 22, 1962).

The last life tenant died in 1985. After payment of the specific legacies, costs, and administration fees, a residue of approximately $500,000.00 remains for distribution to the named charitable organizations. Riggs, being of the opinion that the bequest to Garfield "fail[ed] to take effect," filed for a declaratory judgment to clarify which organizations would be entitled to participate in the distribution of the trust residue.

The trial judge, by memorandum opinion and order, ruled that the bequest to Garfield Memorial Hospital vested upon the death of the testator, but that the hospital was subsequently divested of its remainder interest as the result of its 1962 dissolution. The judge found that the testator had not included any expression of his intent to postpone the vesting of the residuary bequests, but only to postpone payment, possession, and enjoyment of the trust residue until termination of the intervening life estates. As to the matter of divestment, however, the judge relied on the specific nature of the bequest, noting that the testator, a scrivener of wills, had named six specific residuary legatees, provided for the possibility that a gift could "fail to take effect" even after it has vested, and did not include a provision for a bequest to pass to a residuary legatee's successor or assigns, although he included such a provision in naming his executor.[4]

In the trial judge's view, the "fail to take effect" language made clear the testator's intent to preclude the possibility of any entity other than the named legatee claiming an interest in the residuary trust estate. Thus, in his view, the "defunct legatee" cannot take under Item VII(c)(D) of the Will, and to permit WHC to do so would be to interpret the judicially ordered dissolution as a codicil to the Will. The judge also rejected the argument that the doctrine of *cy pres* was applicable since the Will provided for alternative disposition of the failed gift.

## II

■■■ In construing a will, the intent of the testator is paramount. *Read v. Legg,* 493 A.2d 1013, 1016 (D.C.1985); *Wyman v. Roesner,* 439 A.2d 516, 520 (D.C.1981). The court's function is to ascertain the testator's intent and give full effect to that intention unless contrary to law.[5] *Read v. Legg, supra,* 493 A.2d at 1016; *O'Connell v. Riggs National Bank,* 475 A.2d 405, 407 (D.C.1984). Where the intent is clear from the four corners of the will, there is no need for extrinsic evidence or further rules of construction. *See Read v. Legg, supra,* 493 A.2d at 1016; *Davis v. Davis,* 471 A.2d 1008, 1009 (D.C.1984).

■■■ As the trial judge correctly ruled, there is no clear expression of the testator's intent to postpone the vesting the residuary bequests. The language merely postpones payment, possession and enjoyment of the trust residue until termination of the intervening life estates. *See American Securities & Trust Co. v. Sullivan,* 72 F.Supp. 925, 931 (D.D.C.1947). Consequently, the bequest vested upon the death

---

3. Pub.L. 79–648, as amended by Pub.L. 82–221, October 25, 1951, directed the Federal Works Administrator to construct a hospital center in order to assist in providing more adequate hospital facilities in the District of Columbia. The Federal Works Administrator's functions were transferred to the General Services Administration. Federal Property and Administrative Services Act of 1949, ch. 288, § 103, 63 Stat. 377.

4. In Item VIII the testator provided:
The corporate entity resulting from any merger, consolidation, or other corporate realign-

ment to which The Riggs National Bank of Washington, D.C. shall be a party shall, upon consolidation, merger or realignment, succeed to the offices held by said bank under this my last will and testament....

5. On appeal from the grant of summary judgment, this court reviews the record in the same manner as the trial court. *Read v. Legg, supra,* 493 A.2d at 1016 (citing *Holland v. Hannan,* 456 A.2d 807, 814 n. 9 (D.C.1983)).

of the testator. *See In re Estate of Kerr,* 139 U.S.App.D.C. 321, 326–27, 433 F.2d 479, 484–85 (1970); *Pyne v. Pyne,* 81 U.S. App.D.C. 11, 154 F.2d 297 (1946). The only question is whether the testator intended the residuary bequests to be subject to subsequent divestment.

■ The general rule, however, is that absent explicit testamentary intent to the contrary, there is no condition of survivorship until the time of possession of the gift, and a beneficiary's interest in a portion of the residuary is indefeasibly vested when the beneficiary survives the testator, and is not divested by the beneficiary's death prior to the time of possession. *In re Bogart's Will,* 62 Misc.2d 114, 118–119, 308 N.Y.S.2d 594, 599–600 (1970); 5 Page on Wills § 43.18 at 383–85 (1962). *See also Uphaus v. Uphaus,* 315 S.W.2d 801, 804–05 (Mo.1958); *Crowley v. Vaughan* 347 S.W.2d 12, 16 (Tex.Civ.App.1961). The District of Columbia appears to have adopted this rule. *Bank of Galesburg v. Lawrenson,* 99 U.S.App.D.C. 345, 346–47, 240 F.2d 31, 32–33 (1956).

■ Looking to the four corners of the Will, the testator's use of the phrase "fail to take effect" does not, as the trial judge concluded, "unambiguous[ly]" reveal an intent that only those legatees still in their original corporate existence at the termination of the life estates could share in the residue of the trust. The testator used the phrase "fail to take effect" in connection with the life estates, and, at least with respect to the life estates the phrase can only be read as a gift over in the event a life tenant predeceased the testator. Thus, the clause provides for an alternative disposition if there was an original lapse of the bequest. Accordingly, appellants argue that the phrase "fail to take effect" should be read consistently throughout the Will, and particularly here where it appears twice in the same paragraph, to provide for the contingency of an original lapse, before vesting, rather than as creating a divesting condition for a residuary legatee. *See Riggs National Bank v. Summerlin,* 144 U.S. App.D.C. 131, 136, 445 F.2d 201, 206, *cert. denied,* 404 U.S. 851, 92 S.Ct. 91, 30 L.Ed.2d 91 (1971) (particularly when a will is written by a skilled draftsman, normally cannot assume that same word means different things in different parts of the will). *See also* 4 Page on Wills § 30.21 at 141 (1961); 80 Am.Jur.2d *Wills* § 1159 (1975).

The trial judge did not address the use of the same phrase in the same paragraph, nor the fact that his interpretation would mean that the phrase has different meanings within the same paragraph. It is incumbent upon a testator whose will is written by a lawyer to make clear that he intended a different meaning of the phrase when he used it with respect to the legatees. That he provided for an alternative disposition in the event a bequest failed to take effect does not indicate that he necessarily intended the phrase to function as a divesting provision with respect to the residuary legatees. Indeed, in view of the effect of interpreting the phrase to mean two different things within the same paragraph, whereby the gift to Emergency does not fail while the gift to Garfield does, although they stand in the same relation to WHC, we cannot conceive of a skilled scrivener of wills intending other than that the language was limited to a prevesting lapse only.[6] Thus, we hold that the language in dispute here is an anti-lapse provision as is the case with the same language used as to the life estates.

■ Furthermore, even were the phrase "fail to take effect" to be interpreted as a divesting provision for vested residuary bequests, the gift to Garfield would not be divested since WHC is its successor in interest.[7] Courts generally hold that "[a]

6. Although in other respects Emergency was in the same posture as Garfield when WHC was formed, Emergency retained its corporate charter until October 1, 1986, when it was lawfully merged with WHC.

7. At the time the Will was drafted, as well as at the time of the testator's death, appellant suggests that there was no formal legal mechanism to facilitate the merger of nonprofit corporations, and hence, the testator's failure to include language regarding the successors or assigns of the named corporate legatees, relied on by the trial judge, would hardly constitute a compel-

will purporting to establish a charitable trust is to be given liberal construction and legacies for the use of charity will not be declared void if they can, by any possibility, consistent with law, be held valid." *Fidelity Union Trust Co. v. Ackerman*, 18 N.J. Super. 314, 320, 87 A.2d 47, 50 (1952); *Mercy Hospital of Williston v. Stillwell*, 358 N.W.2d 506, 509 (N.D.1984). Cases holding to the contrary are factually distinguishable.[8] "THE RESTATEMENT (SECOND) OF TRUSTS (REV.) § 397, Comment g, ... is in accord with the principle that merger does not terminate a charitable trust of which the corporation is a beneficiary so long as the purposes for which the trust was created are not impaired." *Id.* at 509–10 (citing also 15 AM.JUR.2D *Charities* § 141). As Professor Scott explains, writing at a time when the testator here was still alive, "[w]here the existence of the particular organization is not of the essence of the gift, where the primary purpose of the testator was that the property should be applied to certain charitable purposes, the disposition does not fail [because the corporation never existed or had ceased to exist at the time when the disposition was made or subsequently ceased to exist]." *Fidelity Union Trust Co. v. Ackerman, supra*, 87 A.2d at 50 (quoting 3 SCOTT ON TRUSTS § 397.3 at 2078).[9]

Thus, in *In re Estate of Fuller*, 10 Ill. App.3d 460, 464, 294 N.E.2d 313, 316 (1973), the court upheld the residuary bequest for Our Savior's Hospital notwithstanding its change of name to Holy Cross Hospital and its merger with Passavant Memorial Area Hospital Association after the testator's death.[10] The testator had divided her residuary estate into three equal parts for three named hospitals, one of which was Our Savior's Hospital. Passavant and Holy Cross were both providing acute care facilities in the same city. After the merger Holy Cross ceased to exist as a separate corporate entity. Holy Cross was renamed Frank A. Norris Hospital, and Passavant operated the two hospitals as one unit. The court affirmed the trial court finding that the "testatrix did not intend the residue of her estate to be limited by any organizational structure, but rather it was her desire that the major portion of her estate should be used for general hospital purposes." *Id.* 294 N.E.2d at 316. Likewise, the Pennsylvania Supreme Court held that the merger of Woman's Hospital into University Hospital did not necessitate the application of the *cy pres* doctrine since the charitable purposes of the trusts were not frustrated; therefore University Hospital was entitled to the trust funds. *In re Bodine Trust*, 429 Pa. 260, 263–64, 239 A.2d 315, 317 (1968).

Similarly in *Fidelity Union Trust Co. v. Ackerman, supra*, 18 N.J.Super. 314, 87 A.2d 47, the court upheld the residuary gift where the will provided for residuary gifts, following life estates, to be divided among twelve named charities "or such of them as shall then be existent." *Id.* at 319, 87 A.2d at 49. After the testator's death, Newark Home for Foster Care and another beneficiary, the Association to Provide and Maintain a Home for the Friendless, entered

---

ling reason for concluding that the testator did not intend such successors or assigns to take.

**8.** Thus, in *Greil Memorial Hospital v. First Alabama Bank*, 387 So.2d 778 (Ala.1980), a gift to the Montgomery Tuberculosis Sanitorium, which had been reincorporated as Greil Memorial Hospital, was held to have lapsed since the Sanitorium was dedicated to curing tuberculosis, which became obsolete as a result of treatment changes, and the functions of the reincorporated organization were unrelated to the cure of tuberculosis. *Id.* at 781. *See also In re Harrington's Estate*, 151 Neb. 81, 91, 36 N.W.2d 577, 582 (1949) (gift failed where seminary was no longer maintained or operated even though it was still a legal corporate entity).

**9.** Professor Scott also opined that:

Where a bequest is made to a corporation which was in existence at the time of the testator's death but which ceased to exist before the legacy was paid to it, it has been held that the bequest does not fail even though it would have failed if the corporation had ceased to exist at the testator's death. *Id.*

**10.** The testatrix and her husband had been patients at Holy Cross. The court referred also to testimony that the testatrix, age 94, "was very alert and must have known of the intended merger of the hospitals since it was announced while she was a patient at Holy Cross." *Id.* at 316.

into an agreement to combine and continue their work under the name of Newark Home for Foster Care. Being convinced that the testator did not "indulge in such finicky legalism," the court relied on the proposition that a will purporting to establish a charitable trust is to be given a liberal construction and legacies should not be declared void if they can "by any possibility, consistent with law, be held valid." *Id.* at 320, 87 A.2d at 50.

Other cases are to the same effect. In *Wesley Home Inc. v. Mercantile–Safe Deposit & Trust Co.,* 265 Md. 185, 198–202, 289 A.2d 337, 345–46 (1972), the Maryland Court of Appeals upheld a bequest although the original corporation, The Anchorage of Baltimore City, had conveyed all of its assets to the Young Men's Christian Association (YMCA), which also provided services to seamen, the sole objective sought by the testatrix.[11] The Virginia Supreme Court held that a bequest to the Virginia Mechanics Institute, which was dedicated to vocational education, passed to the School Board of the City of Richmond, which had fully assumed the instruction provided by the Institute, as trustee. *Wellford v. Powell,* 197 Va. 685, 689–691, 90 S.E.2d 791, 795–96 (1956). *See In re Estate of Kellogg,* 33 A.D.2d 388, 394, 307 N.Y.S.2d 907, 911 (1970); *In re Hagan's Will,* 14 N.W.2d 638 (Iowa 1944) (gift to college for promotion of education not defeated where college slightly changed name and was operated by new nonprofit corporation). *See also First National Bank of Cincinnati v. General Assembly Mission,* 610 S.W.2d 927, 929 (Ky.App. 1980); *Mercy Hospital of Williston v. Stillwell, supra,* 358 N.W.2d at 509–10; Iva W. Fratcher, Scott on Trusts, § 397.3 (4th ed. 1989).

It is clear from the 1952 agreement between the three hospitals and the United States that Garfield joined with the other nonprofit hospitals to benefit from the Congressional directive for improved health care services in the District of Columbia. Garfield, Emergency and Episcopal became WHC which was to continue to perform services that they had previously performed.[12] There is nothing to suggest that, as a result of its dissolution, Garfield was "defunct" in the sense that the trial judge appears to have used the word.[13] The characterization in the 1962 judicial order of dissolution of WHC as Garfield's "successor-in-interest" reflects the parties' expectation of Garfield's future interests. The Auditor's report, adopted by the dissolution order, stated that WHC "has assumed and is carrying on the hospital activities formerly carried on by said Garfield...." The fact that Garfield dissolved its separate corporate charter does not mean that its purpose ceased; the dissolution was the only legal recourse available at the time.[14] *See* D.C.Code § 29–701 *et*

---

**11.** The court relied on its decision in *Inasmuch Gospel Mission Inc. v. Mercantile Trust Co.,* 184 Md. 231, 40 A.2d 506 (1945), where it said:

The mere fact that a charitable or educational institution, to which a bequest has been given, is under a different ownership and management from that which the testator knew does not cause a forfeiture of the bequest, especially when the change in operation is for the purpose of insuring continued existence of the institution.

184 Md. at 239, 40 A.2d at 510.

**12.** Garfield's charter, dated May 17, 1884, stated as its objectives "to establish and maintain a general hospital, to be located in the District of Columbia, for the gratuitous medical and surgical treatment of all persons, without distinction of race, sex or creed: Provided, however, That such persons as may be able and willing to defray the expenses of treatment therein may be admitted, upon such terms as may be described by the By-laws of the corporation." Pursuant to the 1952 agreement the federal government was to construct and equip on property known as the Old Soldiers Home "a standard, voluntary, acute, general hospital," to be known as the Washington Hospital Center. The Center would treat adults and children, and have facilities and utilities necessary to accommodate patients and patrons of the hospital center. The plan called for a hospital with 1,000 inpatient beds and an outpatient department capable of serving 400 patient calls daily.

**13.** Webster's Ninth New Collegiate Dictionary defines "defunct" to mean "having finished the course of life or existence (her [defunct] aunt's will) (the committee is now [defunct])."

**14.** The D.C. Nonprofit Corporation Act became effective after Garfield was dissolved by court order, formal dissolution being the only recourse since it had conveyed all its property and assets to WHC. See note 7, *supra.*

*seq.* (1961).[15]

Since the merger of a corporation does not terminate a charitable trust of which the corporation is a beneficiary as long as the purposes for which the trust was created are not impaired, *Mercy Hospital of Williston v. Stillwell, supra,* 358 N.W.2d at 510 (citing *In re Bodine Trust, supra,* 429 Pa. at 263, 239 A.2d at 317),[16] WHC was entitled to receive under the residuary trust established in Mr. Perry's Will. The Will clearly reflects an intent to create charitable bequests to benefit local area corporate health care providers. WHC was designed, as a result of an Act of Congress, to accomplish this result. Hence, to allow WHC to stand in Garfield's shoes for purposes of receiving payment as a residuary legatee carries out the testator's intent. Thus, even if we had held the "fail to take effect" language to be a divesting condition, the bequest did not "fail to take effect."

Accordingly, the judgment is reversed. *Reversed.*

---

**15.** The trial judge properly found that the doctrine of *cy pres* is inapplicable because in the event that the gift fails, the Will provides for the alternative disposition of the failed gift. *See In re Bodine Trust, supra,* 429 Pa. at 263, 239 A.2d at 317; *In re Zumstine's Will,* 10 N.Y.2d 957, 224 N.Y.S.2d 278, 180 N.E.2d 60 (1961).

**16.** *In re Will of Goehringer,* 69 Misc.2d 145, 329 N.Y.S.2d 516 (Surrogate's Court, Kings Cty., 1972), on which appellees rely, appears alone in holding that in limited circumstances an original failure or lapse may exist at the end of an intervening life estate. The court acknowledged that divesting conditions subsequent to vesting are not favored and that no case in that jurisdiction had found a sufficiently specific condition subsequent to enforce. Further, the court ultimately held that a bequest to a Jesuit school, which dissolved shortly after the testator's death, should be distributed to other Jesuit schools. Because the bequest had vested at the time of the testator's death and the Will's gift over language was intended to become effective only in the event of an original failure or lapse, the court deemed it necessary to apply the *cy pres* doctrine in order to fulfill what it determined was the testator's general charitable intent.